# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **Irena J. Banks** | *  |
| | *    Civil Action No. 18-1836 |
| v. | * |
| | * |
| **Board of Education of** | * |
| **Anne Arundel County** | * |

## MEMORANDUM

Irena Banks claims that the Board of Education of Anne Arundel County (the "Board") discriminated against her based on her race and retaliated against her based on her protected activity, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, *et seq.*; discriminated against her based on her age in violation of the Age Discrimination in Employment Act of 1967 ("ADEA"), as amended, 29 U.S.C. § 621, *et seq.*; retaliated against her in violation of the Family Medical Leave Act of 1993 ("FMLA"), as amended, 29 U.S.C. § 2601, *et seq*; and discriminated against her on the basis of race and age and retaliated against her in violation of the Maryland Fair Employment Practices Act ("FEPA"), Md. Code, State Gov't § 20-606. Now pending is the Board's motion for summary judgment. The motion has been fully briefed and no oral argument is necessary. For the reasons stated below, the motion will be granted.

## FACTS

Irena Banks began working at Anne Arundel County Public Schools ("AACPS") in 2002, and in August 2008, became a full-time music teacher at Meade Middle School. (ECF 22-2, Depo. of Irene Banks at 18:6–18; 20:17–18). Banks is African American and was born in 1974. (*Id.* at 7:8–9; ECF 22-1, Def.'s Mot. for Summary Judgment at 4; ECF 33-1, Pl.'s Opp'n at 2 ¶ 1). Banks reported to Christine DeGuzman, the principal of Meade Middle School. (ECF 22-3,

Depo. of Christine DeGuzman at 23:1–3).[1] This case stems from an alleged physical altercation between Banks and a student, B.C., on March 31, 2016. On that day, B.C., who was not a student of Banks, entered her classroom to greet her. (ECF 33-7, Depo. of Banks at 36:7–10). Banks noticed that B.C. was chewing gum, which is against school rules, and told him to spit it out. (*Id.* at 36:11–12; 47:10–12). B.C. refused and started to leave, so Banks "linked arms, at the elbow . . . picked up the trash can" from under her desk, and again told him to spit out his gum. (*Id.* at 36:17–20). B.C. was "kind of jimmying and juking and moving around," and the interaction was "playful" and "goofy." (*Id.* at 36:21–37:5). At some point, as B.C. was trying to pull his arm away, Banks's mouth touched BC.'s arm. (*Id.* at 37:14). B.C. asked Banks if she bit him, and Banks replied, "what is wrong with you, just spit out your gum." (*Id.* at 37:15–19). Eventually, Banks escorted B.C. to the school's main office, holding B.C. at the arm, with the trash can in her other hand. (*Id.* at 38:7–9). She asked another teacher who was in the room, Ms. Dixon, to watch her class. (*Id.* at 38:10–11). After leaving the classroom, B.C. tried to pull away, but Banks continued to take him to the office. (*Id.* at 38:18–21). As they were about to reach the office, B.C. broke free and ran through the rear entrance of the office, and was about to exit through the front entrance when he was stopped by Patricia Miller, the acting assistant principal. (*Id.* at 39:1–6; ECF 22-4, Depo. of Patricia Miller at 8:10). Banks told Miller that she was trying to get B.C. to spit out his gum, and eventually B.C. spit it out. (Depo. of Banks at 39:14–40:3). Banks then left the office. (*Id.* at 40:4).

At some point after, B.C. told Patricia Miller that Banks had bit him, but there is some dispute as to how. According to Miller, after Banks left the office, she began to walk B.C. back to class when, right outside the main office, B.C. told Miller that Banks had bit him, (ECF 33-13, Depo. of Miller at 26:15–27:6), but that Banks "was only playing," (*id.* at 29:16). Miller saw

---

[1] It appears DeGuzman became principal in 2014. (ECF 33-5, Depo. of DeGuzman at 8:2–4).

2

what appeared to be a bite mark on B.C.'s arm. (*Id.* at 28:7–8). According to Jan Sullivan, the school's discipline secretary, B.C. ran into the main office through the front door and told Sullivan, who was standing in the middle of the office, that Banks had bit him. (ECF 33-11, Depo. of Jan Sullivan at 7:8–10, 25:14–17, 29:14–15). Sullivan saw a red mark on his arm. (*Id.* at 30:13). Sullivan then took B.C. to Miller's office, and told Miller what B.C. had said. (*Id.* at 32:19–21, 37:12–14). Because Sullivan's testimony is more favorable to Banks, as it allows for the possibility that B.C. or another individual inflicted the alleged mark, the court will accept Sullivan's testimony as true for the purposes of this motion.

After seeing the red mark or bite mark, Miller took B.C. to the health room. (Depo. of Miller at 30:20–21). The nurse's report indicates that B.C.'s arm was red but the skin was not broken. (ECF 23). According to the report, B.C. reported that "he was horseplaying w/ a teacher and she bit him jokingly" and B.C. was given an ice pack. (*Id.*).

The principal, Christine DeGuzman, was away from school that day, and Miller talked to her by phone. DeGuzman and Miller discussed filing a Child Protective Services ("CPS") report. (ECF 33-5, Depo. of DeGuzman at 69:10–16). According to Miller, DeGuzman told her to call CPS and contact B.C.'s father. (Depo. of Miller at 40:9–10), which Miller did, (*id.* at 41:9–10, 42:2; ECF 24, Report of Suspected Child Abuse or Neglect). Either Miller or DeGuzman also contacted the Board of Education's Office of Investigations. (Depo. of DeGuzman at 69:16–18). The Office of Investigations is led by Sarah Kivett,[2] (ECF 22-9, Depo. of Kivett at 6:16–17, 8:6–8), and it conducts internal investigations of employee misconduct cases. (*Id.* at 7:9–16, 55:10–56:3).

The next day, April 1, 2016, CPS accepted the incident for investigation. (ECF 25, Banks's Employee Case Management Report). After CPS accepted the allegations for

---

[2] Sarah Kivett changed her name from Sarah Czach in July 2016, after she got married. (Depo. of Kivett at 6:7–9).

investigation, Kivett spoke with the deputy superintendent, Arlen Liverman, about placing Banks on administrative leave, (ECF 22-9, Depo. of Kivett at 115:6–18), which Liverman authorized, (*id.* at 131:6–8). Kivett then spoke with DeGuzman, who, on April 1, informed Banks that she needed to leave the school. (ECF 22-3, Depo. of DeGuzman at 92:2–93:7). Banks's administrative leave became effective that Monday, April 4. (Depo. of Kivett at 134:21–135:5). The Anne Arundel County Police Department visited the school on April 1, 2016, and spoke with DeGuzman and Miller.[3] (ECF 33-6, Anne Arundel County Police Department Police Report). Police also visited B.C.'s father, who stated he did not wish to pursue charges at the time. (*Id.*).

On April 4, 2016, the employee case management ("ECM") team authorized an internal investigation by the Office of Investigations. (Depo. of Kivett at 135:5–6). The ECM team consists of eight people, all supervisory officials employed by the Board of Education (*id.* at 77:6–14), and includes the deputy superintendent (*id.* at 88:19). Banks was reassigned, beginning April 5, 2016, to the Transportation Services Office ("TSO"). (ECF 22-12, April 5, 2016, Letter from Arlen Liverman). It is not clear who made the decision to reassign Banks, but it appears the deputy superintendent either mandates or approves reassignments. (Depo. of Kivett at 100:12–15). The Office of Investigations determines the location of the reassignment, and according to Kivett, in Banks's case, the TSO had a vacancy and was a place "where I customarily put employees who have to have a reassignment." (*Id.* at 100:3–4, 133:17–21).

On April 27, 2016, B.C.'s father filed an application for statement of charges against Banks for biting B.C. and, sometime after, Banks was charged with second degree assault. (ECF 22-16, Criminal Summons). On May 4, 2016, CPS concluded their investigation, finding the allegations unsubstantiated. (ECF 26, Investigation Assessment at 8). On June 14, 2016, Banks

---

[3] The police did not speak with B.C. as he was on a field trip that day. (Police Report).

filed an internal employee complaint regarding the handling of the March 2016 incident and her reassignment. (ECF 22-18, Internal Complaint). That same day, DeGuzman gave her a "developing" rating on her performance evaluation. (ECF 33-25 at 12, AACPS Multiple Measure Educator Rating Report).

Banks was released from her position at Meade Middle School on July 18, 2016. (ECF 25, Banks's Employee Case Management Report). According to Kivett, DeGuzman requested the release as Banks's "time out was becoming extensive" and the school needed "a consistent stable teacher in the classroom." (Depo. of Kivett at 138:7–10). During the next ECM meeting, Kivett presented to the ECM team that DeGuzman wanted to release Banks as she did not have a court date until October, and the ECM team authorized the release. (*Id.* at 138:20–139:2).

Between August 22, 2016, and February 13, 2017, Banks was out on FMLA leave. (Depo. of Banks at 128:14–19). During that leave, on October 28, 2016, she filed an EEOC charge of discrimination. (ECF 22-24, Charge of Discrimination). On December 7, 2016, she went to trial, and was found not guilty. (ECF 27, AACPS Investigative Report at 9). On her return from FMLA leave, Banks returned to the TSO. (Depo. of Banks at 198:18–20).

Shelly Powell was assigned to investigate the incident for the Office of Investigations. As part of the investigation, Powell interviewed students and staff members and reviewed the video recordings. (ECF 22-14, Depo. of Powell at 12:16–20; AACPS Investigative Report). The investigation was completed on July 11, 2017. (AACPS Investigative Report). Powell found "sufficient evidence . . . to support the allegation that Ms. Banks restrained [B.C.] by holding on to his arm" and "sufficient evidence . . . to support the allegation that Ms. Banks' teeth made contact with [B.C.'s] arm." (*Id.* at 11). There were rumors that B.C. had bragged that he had bit himself and accused Banks of biting him. (*Id.* at 6). After learning about these rumors, Powell

5

returned to the school to interview people who might have information about this. (ECF 33-18, Depo. of Powell at 20:14–16). It appears that some teachers heard these rumors but could not remember who specifically had said them. (AACPS Investigative Report at 7–8). Powell did not interview B.C. about the rumors he bit himself because he was not available at that time. (Depo. of Powell at 22:20–21). Powell also did not check surveillance videos in the main office, which may have shown B.C. run up to Sullivan, in accordance with her statement, because by the time Powell got that information from Sullivan, the video would have been automatically erased. (ECF 33-8, Appeal Hearing Before the Anne Arundel County Board of Education, Examination of Shelly Powell, at 100:17–21). B.C. also apparently has had some disciplinary issues involving harassing behavior and vulgar language. (ECF 33-17, Depo. of G.N. at 28:9–29:17). According to G.N.,[4] a teacher at Meade Middle School, B.C. had previously lied to teachers. (*Id.* at 30:4–8).

On February 17, 2017, Banks filed a response to a request from Employee Relations for more detail regarding her June 2016 internal complaint. (ECF 22-20, September 21, 2016, Letter from Employee Relations; ECF 22-19, February 17, 2017, Response). On June 9, 2017, Banks's reassignment to the TSO concluded. (ECF 22-22, August 3, 2017, Letter from S. Kivett). On July 7, 2017, CPS amended their findings from "unsubstantiated" to "ruled out." (ECF 33-21, July 7, 2017, Letter from Department of Social Services). On August 3, 2017, the Superintendent recommended that Banks receive a 10-day suspension as discipline for the March 2016 incident (ECF 33-22), but that was later reduced, on appeal, to a letter of reprimand (ECF 33-23).

On August 28, 2017, Banks returned to duty as a full-time music teacher, splitting time between two elementary schools. (ECF 22-22, August 3, 2017, Letter from S. Kivett). Upon

---

[4] As this memorandum will discuss some accusations against this teacher, it will use the teacher's initials.

Banks's return to duty, Kivett consulted with David Kauffman, the music coordinator for AACPS, to find a position for Banks. (ECF 36-3, Depo. of Kivett at 145:17–146:19). At the time, a middle school choral position was not available. (ECF 36-4, Affidavit of David Kauffman ¶ 5). Banks continues to split her time between two elementary schools. (ECF 33-7, Depo. of Banks at 137:1–2). She states that she was offered a position in the spring of 2018 at another elementary school, but two weeks later that offer was rescinded without explanation. (*Id.* at 139:6–13). Banks later spoke with the principal of that school, Stacy Gray, who said she rescinded the job offer because "she had heard some disturbing things that caused her to change her mind and that she had spoken with three people" but did not say to whom she had spoken. (*Id.* at 139:21–140:5). Banks also states that she interviewed for a position at Meade Middle School in the spring of 2018, but was not hired. (*Id.* at 140:20–141:6).

Banks brought a seven-count complaint against the Board. She alleges racial discrimination (Count I) and retaliation (Count II) in violation of Title VII, age discrimination in violation of the ADEA (Count III), retaliation in violation of the FMLA (Count IV), and racial discrimination (Count V), age discrimination (Count VI), and retaliation (Count VII) in violation of FEPA. The Board seeks summary judgment on all counts.

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no *genuine* dispute as to any *material* fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (emphases added). "A dispute is genuine if 'a reasonable jury could return a verdict for the nonmoving party.'" *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012)). "A fact is material if it 'might affect the outcome of the suit

under the governing law.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Accordingly, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment[.]" *Anderson*, 477 U.S. at 247–48. The court must view the evidence in the light most favorable to the nonmoving party, *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (per curiam) (citation and quotation omitted), and draw all reasonable inferences in that party's favor, *Scott v. Harris*, 550 U.S. 372, 378 (2007) (citations omitted); *see also Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 568–69 (4th Cir. 2015). At the same time, the court must "prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993)).

## DISCUSSION

### I. Administrative Exhaustion

Title VII, the ADEA, and FEPA require plaintiffs alleging discrimination to exhaust their administrative remedies prior to initiating suit. 42 U.S.C. § 2000e-5(f)(1); 29 U.S.C. § 626(d); Md. Code Ann., State Gov't § 20-1004(c)(1), § 20-1013(a). The Fourth Circuit has "held that the scope of the plaintiff's right to file a federal lawsuit is determined by the [EEOC] charge's contents" to prevent plaintiffs from "rais[ing] claims in litigation that did not appear in [their] EEOC charge[s]." *Sydnor v. Fairfax Cty., Va.*, 681 F.3d 591, 593 (4th Cir. 2012) (internal citation and quotation marks omitted). Claims not in the EEOC charge may be raised, however, if they are "like or related to allegations contained in the charge and growing out of such allegations during the pendency of the case[.]" *Stewart v. Iancu*, 912 F.3d 693, 705 (4th Cir. 2019) (internal citation and quotation marks omitted).

Banks filed her charge of discrimination in October 2016 and did not amend it to include the events that happened thereafter. As the reassignment to the elementary schools (instead of returning to Meade Middle School), the proposed ten-day suspension, and the letter of reprimand all grow out of the allegations contained in Banks's EEOC charge, these allegations are administratively exhausted. It is less clear whether the 2016 "developing" rating and the failure to hire Banks for the Meade Middle School position in the spring of 2018 are "like and related" to the allegations in Banks's EEOC charge, as these allegedly adverse actions are, at least facially, not related to the March 2016 incident. Because they involve the same decisionmaker, Christine DeGuzman, as some of the allegations contained in the EEOC charge, the court will assume they are exhausted. Banks, however, has not exhausted the allegation regarding the rescission of the job offer in the spring of 2018, as this action involves a different decisionmaker, different school, and different timeframe than the allegations in Banks's EEOC charge.[5]

II. Race and Age Discrimination

Title VII of the Civil Rights Act of 1964 prohibits an employer from discriminating against an employee on the basis of, *inter alia*, the employee's race. 42 U.S.C. § 2000e-2(a). The ADEA prohibits employers from discriminating against employees because of their age. 29 U.S.C. 623(a)(1). FEPA is the "state law analogue of Title VII" and courts in this district have previously used federal standards to analyze such claims. *Linton v. Johns Hopkins Univ. Applied Physics Lab.*, LLC, No. CIV. JKB-10-276, 2011 WL 4549177, at *4 n.3 (D. Md. Sept. 28, 2011).[6] A plaintiff may avoid summary judgment by either "presenting direct or circumstantial

---

[5] Banks argues that she communicated to the EEOC that the rescission of the job offer was discrimination and retaliation but the EEOC never gave her an amended charge of discrimination to review and sign, and Banks "should not be held at fault for the EEOC's carelessness." (ECF 33-1, Banks's Opp'n at 21). Banks, however, provides no case law supporting her argument that, in this case, the court should look beyond the charge filed with the EEOC, and the court declines to do so.

[6] Unreported cases are cited for the soundness of their reasoning, not for any precedential value.

9

evidence that raises a genuine issue of material fact as to whether an impermissible factor such as race motivated the employer's adverse employment decision" or by proceeding under the burden-shifting framework first established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310, 318 (4th Cir. 2005); *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 285 (4th Cir. 2004) (ADEA claim). Banks does not provide direct evidence of discrimination, and both the Board and Banks proceed under the *McDonnell Douglas* framework.

Under the *McDonnell Douglas* framework, the plaintiff bears the initial burden of establishing a prima facie case of discrimination. *McDonnell Douglas Corp.*, 411 U.S. at 802. This requires the plaintiff to show that "1) he is a member of a protected class; (2) he was performing at a level that met his employer's legitimate expectations at the time of the adverse employment action; (3) he suffered an adverse employment action; and (4) his employer treated similarly situated employees outside his protected class more favorably." *Dones v. Donahoe*, 987 F. Supp. 2d 659, 667 (D. Md. 2013). After the plaintiff has made out a prima facie case, the "burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action." *Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 214 (4th Cir. 2007) (internal quotation marks and citation omitted). "This burden, however, is a burden of production, not persuasion." *Id.* The plaintiff must then "prove by a preponderance of evidence" that the employer's reasons were pretext for discrimination. *Id.*

Assuming that Banks has made out a prima facie case of discrimination on most of her claims,[7] she has not provided sufficient evidence to create a genuine dispute of material fact that

---

[7] Regarding Banks's nonselection for the Meade Middle School position in Spring 2018, to the extent Banks argues it was discriminatory, it has not been sufficiently pled or briefed. For example, Banks has not provided the race or age of the person who ultimately was hired, or whether that person had previously engaged in protected activity.

the Board's legitimate, nondiscriminatory reasons are pretextual or that the Board's actions were motivated by discrimination.[8] Based on B.C.'s accusation that Banks bit him, DeGuzman and Miller decided to contact CPS. According to Miller, she contacted CPS "[b]ecause as a teacher you're a mandated reporter of any child abuse, and in my personal opinion what [B.C.] reported to me, I had to report to CPS." (ECF 22-4, Depo. of Miller at 49:2–4). Kivett and Liverman decided to temporarily reassign Banks "[b]ecause she was a subject of the" CPS investigation. (ECF 22-9, Depo. of Kivett at 134:4–6). After the CPS investigation concluded, Banks remained on temporary assignment because the Office of Investigations investigation had not concluded and "shortly thereafter we received indication that there [were] criminal charges." (*Id.* at 123:10–17). Because Banks could not return to teaching until the criminal case against her was resolved, which at that time was at least several months away, DeGuzman requested in July 2016 that she be released from her position, and ECM agreed. (*See id.* at 123:15–17 ("[Y]ou cannot work in the school setting while under investigation for criminal charges for assault against a student."), 138:7–10 (stating that DeGuzman told her that they needed a consistent stable teacher in the classroom)). Banks was later permanently reassigned to two elementary schools because those were the positions available when she was able to return back to work. (Affidavit of Kauffman ¶ 5). She received a letter of reprimand because she "restrained a student by holding onto his arm and refusing to let him go." (ECF 22-21, Letter of Reprimand). Additionally,

---

Therefore, Banks has not made out a prima facie case with respect to the nonselection.

[8] The court notes that Banks's reassignments likely are adverse employment actions. A reassignment does not constitute an adverse employment action absent a decrease "in compensation, job title, level of responsibility, or opportunity for promotion." *James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 376 (4th Cir. 2004) (quoting *Boone v. Goldin*, 178 F.3d 253, 256–57 (4th Cir. 1999)). The reassignment to TSO involved a significant change in level of responsibility and job title, and both Banks's reassignment to TSO and, later, to the elementary schools resulted in a decrease in her choral stipend. (ECF 33-7, Depo. of Banks at 131:5; ECF 33-29, Extra Curricular Pay Scales, School Year 2013–2014). The proposed suspension, letter of reprimand, and "developing" rating are probably not adverse actions, *see Jeffers v. Thompson*, 264 F. Supp. 2d 314, 330 (D. Md. 2003) (proposed suspension); *Adams v. Anne Arundel Cty. Pub. Sch.*, 789 F.3d 422, 429 (4th Cir. 2015) (reprimand); *James*, 368 F.3d at 377 (4th Cir. 2004) (performance rating), but for the purposes of this motion the court will assume that they are.

Banks received a "developing" rating because she failed to submit two Student Learning Objectives. (ECF 22-3, Depo. of DeGuzman at 47:15–48:7).

Banks identifies several comparators to demonstrate that the Board treated teachers outside of her protected classes more favorably. She argues that G.N., a Caucasian teacher born in 1971, was treated more favorably with regard to three incidents in 2013, 2014, and 2016, in which G.N. was accused of abuse or inappropriate touching. The 2013 incident, however, where a student accused G.N. of inappropriately touching her (ECF 28, Employee Case Management Report), is not an appropriate comparator because it involved a different principal (ECF 33-17, Depo. of G.N. at 38:13–17) and was reported to CPS, which decided not to take the case (ECF 28, Employee Case Management Report). The 2016 accusation was caught on video, and showed the student running at and initiating contact with G.N. (Depo. of G.N. at 58:7–15). This is unlike the circumstances of Banks's case, where Banks admitted to initiating contact with B.C. In regard to the 2014 accusation, where a student claimed that G.N. inappropriately touched her when she was removing her jacket (*Id.* at 45:13–15), the school opted to handle it internally instead of immediately reporting the accusation to CPS.[9] Therefore, this presents some evidence that G.N. was treated more favorably with respect to the 2014 incident.

Banks also points to four other Meade Middle School teachers,[10] names unknown, who she argues were treated more favorably. The accusations against three of these teachers, however, were reported to CPS, which decided not to take the cases for investigation.[11] In

---

[9] As to the 2014 accusation, Banks was in the room at the time, and later sent an email to Troy Hermann, the assistant principal, stating that G.N. did not touch the student. (ECF 22-28, May 13, 2015, Email from Banks). The school "look[ed] into it" and the student later recanted. (ECF 33-17, Depo. of G.N. at 53:18–21).

[10] Although the employee case management reports, containing the accusations, are redacted as to the teacher's school, the Board identified which reports involve Meade Middle School teachers. (ECF 33-36).

[11] A white teacher older than Banks was accused in 2014 of physical abuse and inflicting a red mark on a student; this incident was reported to CPS, which did not take the case for investigation. (ECF 33-35, Case No. 2014135 Employee Case Management Report; ECF 33-34 (showing race and age)). An Asian teacher older than Banks was accused in 2017 of sexually abusing a student, which was reported to CPS, but they did not take the case. (ECF 33-

12

Banks's case, however, CPS did take the case, and this was a major factor in the decision to reassign Banks. Therefore, these three cases are not appropriate comparators. Another teacher, Asian and older than Banks, was accused in 2018 of pushing a student and slamming the classroom door in the student's face, as well as inappropriate touching, but the school handled the matter internally and gave the teacher a counseling letter. (ECF 33-40, Case No. 2017294; ECF 33-39 (showing race and age)). As this matter was handled internally, it might be evidence of more favorable treatment.[12]

While Banks points to two accusations that the school handled internally, it is undisputed that the school reported accusations against teachers outside of Banks's protected classes to CPS. Additionally, the accusation against one of the teachers that Banks claims was more favorably treated was investigated, presumably by the Office of Investigations, even though CPS did not take the case. (ECF 33-38, Case No. 2016283 Case Management Report). Further, the Board has pointed to a white Meade Middle School teacher that was disciplined and reassigned in the same manner as Banks. This teacher grabbed a student's arm and dragged the student into the hallway in 2015. (ECF 36-9, Case No. 2015103 Employee Case Management Report; ECF 33-34 (showing race and birth year of 1959)). The school notified CPS, CPS accepted the case for

---

38, Case No. 2016283 Employee Case Management Report; ECF 33-37 (showing race and age)). A white teacher ten years younger than Banks was accused in 2016 of grabbing a student's arm; the school interviewed student witnesses and then reported the accusation to CPS, which did not take the case for investigation. (ECF 33-41, Case No. 2015302 Employee Case Management Report; ECF 33-34 (showing race and age)).

[12] Banks also provides three additional comparators identified by G.N. and Troy Hermann in their depositions. G.N. identified two teachers at Meade Middle School accused of inappropriate touching, at least one of whom eventually returned to his position, but did not provide information as to whether they were investigated, reported to CPS, or disciplined, and the Board has no record of any complaints made against these individuals. (Depo. of G.N. at 74:11–12, 76:10–19, 78:4–13, 79:1–15; ECF 33-15, Def.'s Amended Responses to Pl.'s Request for Admissions at 7). Banks cites to the Board's admissions as evidence that these teachers were not referred to CPS or the Office of Investigations or disciplined, but in those admissions the Board clarified that they have no record of any allegations made against either individual. (ECF 33-15, Def.'s Amended Responses to Pl.'s Request for Admissions at 7). Hermann identified a teacher at AACPS but not at Meade Middle School, who was accused of scratching a student and was reported to CPS but eventually returned to her position, but does not know if she was reassigned or disciplined. (ECF 33-33, Depo. of Hermann at 4:6, 6:10–7:22, 9:1–20). Therefore, Banks has not provided sufficient evidence to demonstrate that these individuals are comparators or that they were treated more favorably.

investigation, and the teacher was placed on paid administrative leave and reassigned pending the investigation. (Case No. 2015103 Employee Case Management Report). CPS ruled out the incident and the teacher received a letter of reprimand. (*Id.*).

Banks also argues that the school did not properly investigate the rumors that B.C. bit his own arm. The undisputed evidence, though, shows that Powell did investigate the rumors. Powell spoke with Troy Hermann, who stated that either Adell Guarin or Valerie Montgomery had told him that B.C. was "making up lies about teachers to get them in trouble." (ECF 27, AACPS Investigative Report at 6–7). Guarin told Powell that she did not know anything about B.C. injuring himself. (*Id.* at 6). Montgomery told Powell that a student told her that "[B.C.] had bit himself, had another student take photos of it, and then accused Ms. Banks of biting him" and that Walter Fernandez, a permanent substitute, knew about this. (*Id.* at 7). Powell then spoke with Fernandez, who said he had heard that "[B.C.]'s friend had bit him and then they blamed it on someone else." He could not recall which specific student said this.[13] (*Id.* 7–8). Although it may have been prudent for Powell to question B.C. directly, he was unavailable, and there is no indication that Powell did not interview B.C. for discriminatory reasons. Further, none of these individuals could provide the names of the students who allegedly learned that B.C. bit himself, and Banks does not provide any relevant evidence that was available but that Powell did not obtain.

Banks does not provide any other evidence of discrimination. Therefore, Banks has not provided sufficient evidence to create a genuine dispute of material fact that the Board's reasons for its actions are pretextual, or that it was motivated by discrimination.

III. Retaliation

---

[13] G.N. also stated he heard sixth grade teachers and students say that B.C. bit himself, but he did not remember who specifically said this. (ECF 33-17, Depo. of G.N. at 32:3–9).

14

Title VII prohibits an employer from retaliating against an employee who has "opposed any practice made an unlawful employment practice" by Title VII. 42 U.S.C. § 2000e-3. As with claims of Title VII discrimination, a plaintiff lacking direct or circumstantial evidence of retaliation may prove her allegations using the *McDonnell Douglas* framework. *Foster v. Univ. of Maryland-E. Shore*, 787 F.3d 243, 250 (4th Cir. 2015). To establish a prima facie case of retaliation, a plaintiff must demonstrate that: (1) she engaged in protected activity; (2) her employer took adverse employment action against her; and (3) a causal connection existed between the protected activity and the adverse action. *Id.* The burden then shifts to the defendant to show that the purportedly retaliatory action was the result of a legitimate non-retaliatory reason. *Id.* The plaintiff then must show that the purported reasons are pretext for retaliation. *Id.*

The Family Medical Leave Act also protects employees from discrimination or retaliation for exercising their substantive rights under the FMLA. *Vannoy v. Fed'l Reserve Bank of Richmond*, 827 F.3d 296, 304 (4th Cir. 2016). Banks may also use the *McDonnell Douglas* burden shifting framework to prove her FMLA retaliation claim.

Assuming that Banks makes out a prima facie case of retaliation,[14] she has not provided sufficient evidence to create a genuine dispute that the Board's actions were retaliatory. Banks argues that the fact that the Board did not abide by the progressive disciplinary policy when issuing the suspension demonstrates pretext. (ECF 33-1, Banks's Opp'n at 35). The policy that Banks refers to, however, clearly states that "[s]teps in progressive discipline can be skipped or

---

[14] Although the Board argues that Banks's June 14, 2016, internal complaint was not protected activity under Title VII because Banks did not allege in it that she was being targeted based on a protected category, the June 14, 2016, letter alleged that, of the teachers who have been removed, quit, or targeted by DeGuzman, "a large number of these educators being removed and otherwise forced out are People of Color; specifically, African-Americans." (ECF 22-18, at 7, Internal Complaint). Therefore, it appears that Banks was, in part, alleging racial discrimination.

15

repeated for a variety of reasons." (ECF 33-30, Non-Disciplinary and Disciplinary Steps). Here, according to Kivett, "due to the fact that [Banks] grabbed the child, held onto him, restrained him in some fashion, and applied her teeth to his arm we opted to skip to a suspension due to the nature, the severity of the incident." (ECF 22-9, Depo. of Kivett at 149:2–9). Banks has not provided evidence to dispute this legitimate nondiscriminatory reason, nor has she otherwise provided evidence showing the Board's actions were retaliatory.[15]

## CONCLUSION

For the above reasons, the court will grant the Board's motion for summary judgment. A separate order follows.

2/12/20
Date

/s/ CCB
Catherine C. Blake
United States District Judge

---

[15] As Banks did not engage in protected activity until after DeGuzman and Miller reported the accusation to CPS, the reporting to CPS cannot be retaliatory.

16